Richard M. Pachulski (CA Bar No. 90073)
John D. Fiero (CA Bar No. 136557)
Maxim B. Litvak (CA Bar No. 215852)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010

E-mail:rpachulski@pszjlaw.com
       jfiero@pszjlaw.com
       mlitvak@pszjlaw.com

Attorneys for R. Todd Neilson,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br>BDB MANAGEMENT, LLC,<br><br>              Debtor. | Case No.: 08-31001 (TEC)<br>Chapter 11<br>**TRUSTEE'S REPORT DATED JANUARY 31, 2009** |

R. Todd Neilson, chapter 11 trustee, hereby submits the following report regarding the nature and extent of his investigation of the business and financial activities of William James "Boots" Del Biaggio III ("Boots"), BDB Management LLC ("BDB") and BDB Management III LLC ("BDB III") (collectively, the "Debtors"), and certain affiliates and related entities.

**I.**

**INTRODUCTION**

To best of the Trustee's knowledge, none of the Debtors maintained a traditional electronic bookkeeping system, such as Quickbooks (or even an Excel file-based accounting system). Thus, the Trustee began his investigation with only the paper and electronic records provided by Boots. Those records have been supplemented over time by formal and informal requests for documentation from banks, brokerage houses, clearing brokers, and persons who filed proofs of claim. Even so,

there have been instances of lost records, requests that have not fully complied with, or delays associated with the difficulty of unearthing some of the data. In addition, the Trustee has found the vast majority of proofs of claim submitted by those who loaned money to or invested with the Debtors to be lacking in the type of specific transaction detail his forensic accountants at LECG need to fill the holes created by these issues.

This Report is interim, and is based solely on the investigation conducted to date. Further investigation could lead to different or more complete conclusions. With the current information, the Trustee does not believe it is possible to trace the money loaned to or invested with the Debtors. That conclusion is subject to change as additional data is obtained and reviewed, and is made with a full reservation of the Trustee's right to supplement, modify and amend this Report.[1]

## II.

## BANK ACCOUNT ANALYSIS

### A. General

At the instruction of the Trustee, LECG prepared a detailed cash receipt and disbursement database covering the time period from May 2004 through June 6, 1008 (the "Petition Date"). This task was complicated by the lack of any electronic accounting system or general ledgers maintained by Boots.[2] Additionally, formal check registers were not maintained.

In compiling the database, LECG examined and analyzed all available banking records, including bank statements, check copies, deposit slip copies, wire advices, etc., which were then organized and assembled by banking institution and then by individual account. To date, LECG has identified 42 individual bank accounts (including checking accounts, savings accounts, money market accounts, credit lines, etc.) maintained at 10 different banking institutions. These bank accounts include Boots' personal accounts and the accounts of related entities such as BDB, BDB Management II LP ("BDB II"), BDB III and Sand Hill Capital Partners III LLC ("SHCP III").

---

[1] Nothing contained herein is intended to serve as an admission that one or more estates is liable to another, or the others. Additionally, in this Report, the Trustee uses terms such as "subscriber," "investment" and the like without taking any position with regard to whether any given sum transferred to a debtor or affiliate is properly characterized as debt or equity in these bankruptcy cases. The terms are used interchangeably without intent to cause or imply legal consequences.

[2] This Report assumes that all actions ascribed to any of the entities were actions taken by Boots on their behalf. Because Boots is the subject of a pending federal criminal proceeding, he has not confirmed for the Trustee that this assumption is correct.

**Exhibit A** provides summary information regarding the 42 bank accounts that have been identified as being in the name of, or related to, the Debtors and their affiliates.

Of the 42 bank accounts identified, documentation sufficient for analysis is available for 31 accounts. **Exhibit B** provides a summary of those 31 bank accounts, including the name in which the account was maintained, the total number of transactions, and the total dollar amount of receipts and disbursements for each account.[3]

**Exhibits C and D** provide a summary of the transactions involving all identified bank accounts maintained in the names of BDB and BDB III, respectively, including the total number of transactions and the total dollar amount of receipts and disbursements.

Among other things, **Exhibit C** shows that Boots paid $631,700 into BDB's bank accounts, while BDB transferred $1,240,000 to Boots. **Exhibit D** shows that Boots paid no money into BDB III's single account, while BDB III transferred $1,150,000 to Boots.[4]

In total, LECG has analyzed 8,617 bank account receipt and disbursement transactions. Of those transactions, 1,716 were receipts totaling approximately $226,497,000, while 6,901 were disbursements totaling approximately $226,685,000. See **Exhibit E** for a summary of all 8,617 transactions by individual payee and payor.

### B. Missing Documentation

As a result of its preliminary analysis of the records provided by Boots, LECG identified a substantial amount of missing documentation. LECG worked with Trustee's counsel to prepare document requests for additional bank statements and supporting documentation from multiple banks, including Heritage Bank Of Commerce, Legacy Bank NA and United American Bank. Documentation has been received in response to all of these requests, but it is not complete and it continues to come in. LECG has analyzed nearly all additional documentation received from these banks and incorporated its analysis into the receipt and disbursement database. The one exception is documentation received from United American Bank in the past week, which LECG is currently analyzing.

---

[3] LECG is working with Trustee's counsel in order to obtain documentation related to the remaining 11 accounts, and also to attempt to gain additional transaction-specific information from the claimants of the Debtors, who presumably have cancelled checks and other important missing documentation.

[4] This information relates to bank account transactions only, and does not factor in brokerage account activity.

In addition to bank records maintained historically by the Boots and those obtained directly from the banks, LECG has considered and reviewed other potential sources of bank documentation, including documents provided by the United States Securities & Exchange Commission, and supporting records included in proofs of claim filed against the estate.

As of the current date, LECG is missing supporting documentation for 274 transactions, 178 of which are receipt transactions totaling over $49,187,500. The remaining 96 transactions are for disbursements totaling over $14,902,000. Although relatively small when compared to the total number of overall transactions, the missing documentation accounts for 22% of all receipts based on dollar amount and 7% of all disbursements based on dollar amount.

C. **Subscriber Analysis (Including BDB & BDB III)**

The documentation provided by Boots establishes that certain individuals he identified as "subscribers" provided millions of dollars to Boots on account of his related entities, including the following:

1. **BDB**: No less than $10,020,000 was reportedly provided to BDB by approximately 43 subscribers (including over $2,990,000 from Boots). Activity involving BDB began no later than November 2003 and continued through January 2005. Pursuant to available documentation, the investment purpose of BDB was to purchase shares of Heritage Commerce Corp ("HTBK") stock.

2. **BDB II**: No less than $11,425,000 was reportedly provided to BDB II by approximately 45 subscribers (including $2,000,000 from Boots). Activity involving BDB II began no later than April 2006 and continued through August 2007. Pursuant to available documentation, the investment purpose of BDB II was to purchase shares of Onco Petroleum ("ONCO") stock.

3. **BDB III**: No less than $2,756,000 was reportedly provided to BDB III by approximately 6 subscribers (including approximately $1,000,000 from Boots). Activity involving BDB III began no later than January 2007 and continued through April 2007. Pursuant to available documentation, the investment purpose of BDB III was to purchase shares of Pacific Premier Bancorp Inc ("PPBI") stock.

Boots historically maintained schedules detailing what he termed "Subscriber Information." This information included the names of subscribers and the dates and amounts of reported investments. LECG has utilized these schedules to facilitate its receipt and disbursement analysis. However, several problems have been encountered with regard to these subscriber schedules. For instance, in those instances where LECG has supporting bank account documentation detailing a subscriber's investment, the dates detailed on the bank records rarely agree with the dates detailed on the subscriber schedules and are sometimes off by days, weeks or even months. In addition, amounts detailed on the subscriber schedules do not always agree with amounts detailed in the available bank documentation. Further, some subscriber investments were deposited as part of a bulk deposit (i.e. 5 deposits of $200,000 each are combined into one bulk deposit of $1,000,000). The subscriber schedules detail individual amounts (which may or may not be correct), but not the total deposit made by Boots on any given day. These and other issues have relegated the subscriber schedules to the status of a useful resource, but certainly not supporting documentation that LECG can rely upon.

Pursuant to the subscriber schedules, subscriber activity began no later than November 2003. However, as previously discussed, the earliest bank account records in the possession of LECG begin in May 2004. As a result, LECG and Trustee's counsel have made requests of Legacy Bank (now known as United Security Bank) in an effort to obtain the documents that relate to this earlier time period.

**D.      Missing Information**

As of the current date, LECG has identified 748 transactions potentially related to dealings with the various subscribers in Boots' investment schemes. Because of missing documentation, only 40 of these transactions specifically to transfers into or out of BDB, BDB II, or BDB III, thereby leaving 708 transactions still unresolved. When one compares the amount of subscriber receipt activity identified to date with the total reported receipts related to BDB, BDB II and BDB III, it becomes apparent that a substantial number of receipt transactions are insufficiently documented. Even in the instances where LECG has supporting documentation, it is sometimes not possible to determine which entity (i.e. BDB, BDB II, BDB III, etc.) the receipt or disbursement relates to,

because a number of individual subscribers transferred funds to more than one entity and/or Boots himself. In order to determine which entity or entities were involved on an individual transaction basis, LECG needs the requested supporting documentation from not only the banks, but also the individual subscribers. These documents are vital to the receipt and disbursement tracing analysis, and will also be invaluable when analyzing the nearly $505,560,000 in claims filed against these estates.

### E. Specific Example Involving BDB III

The following discussion of subscriber activity involving BDB III provides an example of the issues presented by the data. BDB III has by far the smallest number of investors – just six subscribers reportedly transferred $2,756,000. Of the 42 total bank accounts identified to date, only one account in the name of BDB III has been identified. The history of this account includes only 6 transactions, including 2 receipts totaling $1,150,000. These two deposits into the BDB III account obviously do not match the total reported investment amount of $2,756,000. It appears that the remaining transfers made by BDB III subscribers were deposited into accounts other than the BDB III account. However, without complete documentation, it is not currently possible to specifically identify these remaining deposits.

LECG recently received supporting documentation from one subscriber, Robert Peters ("Peters"), which allowed LECG to tie a $1,000,000 deposit into the BDB III account to his investment. The $1,000,000 deposit cleared the bank on January 22, 2007. The account had a zero balance immediately prior to this deposit. On January 23, 2007, the entire $1,000,000 was transferred to Boots' personal bank account at United American Bank. At the time of the transfer, his personal account was in a negative overdraft position in excess of $434,000. This negative overdraft position began on January 19, 2007 in part as the result of two checks which had cleared the bank in the total amount of $450,000. It is interesting to note that those two checks were both made payable to Peters and pursuant to memo descriptions on the checks that made clear they were partial repayments of loans Peters had made to Boots. Thus it appears that Boots used almost half of Peters' $1,000,000 reported investment in BDB III in order to repay Peters for existing loans made to Boots. On the same day Boots moved the $1,000,000 from the BDB III account to his personal

account (i.e. January 23, 2007), a $200,000 wire was initiated from the personal account to Pershing LLC, the clearing broker for Merriman Curhan Ford & Co ("Merriman"). Pursuant to available documentation, the wire was made to the Debtor's brokerage account held in the name of the 1999 Del Biaggio Family Trust #2. A review of brokerage statements for this account indicates that the account was in a margin (i.e. negative balance) position of approximately $840,000 prior to the $200,000 transfer. Prior to this wire transfer, 50,000 shares of HTBK stock had been purchased on January 18, 2007 for $1,337,500. According to the available brokerage account documentation, it appears that HTBK stock was the only stock held in this particular brokerage account throughout its history. In May 2008, 40,000 shares were sold. The remaining 10,000 shares were sold in June 2008 by Merriman in order to cover Boots' margin position in other Merriman brokerage accounts. Of note, Peters' original $1,000,000 investment was allegedly made in BDB III, whose stated purpose was the purchase of PPBI stock, not HTBK stock.

No other large disbursements were made from the personal account contemporaneously to the $1,000,000 deposit on January 23, 2007; however, a substantial number of smaller disbursements are made, which appear to be related to (1) transfers to other related entities or (2) personal expenditures of the Debtor, including expenditures for home mortgages, loans, home decorating, credit cards, charitable donations.

LECG has no supporting documentation related to the other deposits made into the BDB III account or into any other bank account on account of BDB III subscriber transfers, so it is impossible at this time to specifically match the other deposits back to any of the remaining BDB III subscribers. Once the required supporting documentation is received, it will be possible to analyze not only the remaining BDB III activity, but also activity involving numerous other entities, including BDB and BDB II.

**F.    Transfers In and Out of Boots' Personal Accounts**

LECG has conducted a preliminary evaluation of how Boots used the various bank accounts in order to transfer funds to and from Boots' own personal accounts or those of related entities. While no definitive conclusions are possible at this time, issues and concerns have been identified which require additional investigation.

**Exhibit E** identifies 154 transfers between Boots' personal bank accounts and the bank accounts of numerous related entities. In Boots' two main personal bank accounts at Legacy Bank (i.e. Account #1501147) and United American Bank (i.e. Account #11001682), 82 transfers from related entities into these personal accounts have been identified totaling $24,370,550. There are also 72 identified transfers out of these personal accounts to related entities totaling over $8,468,000. The difference between monies transferred to Boots from the entities and monies transferred by Boots to the entities is thus $15,902,550.

**Exhibit F** is a summary of transfers involving Boots' personal bank accounts, including the name of the entity from which or to which the transfer was made. Notably, the largest number and dollar amount of transfers to and from Boots' personal accounts involved SHCP III. These transactions include 33 transfers into Boots' personal bank accounts totaling $12,194,000, and 14 transfers out of the personal accounts to SHCP III totaling $1,890,000. The net difference is $10,304,000.

### G.  Transfers In and Out of Various Entity Bank Accounts

There are another 236 additional transfers between the various bank accounts of the entities operated by Boots. 122 transfers into these related entity accounts totaling over $20,957,000 have been identified. 114 transfers out of these related entity accounts totaling over $17,864,000 have been identified. While there is not enough evidence available to definitively conclude whether any of those transactions are improper, numerous transactions raise concerns which require additional investigation, especially those transfers between entities Boots operated, but are seemingly unrelated to one another other (i.e. transfers to and from SHCP III and BDB, BDB II, Power Play Real Estate Fund LP, etc.). **Exhibit G** contains a summary of these transfers, including the name of the entity from which or to which the transfer was made.

### H.  Bank Transactions Involving Brokerage Accounts

40 bank account transactions involving brokerage accounts have been identified. Of these 40 bank account transactions, five involved accounts maintained at The Shemano Group ("Shemano"), while the remaining 35 involved accounts at Merriman Curhan Ford & Co ("Merriman"). The Shemano transactions included 5 disbursements to various Shemano brokerage accounts totaling

59914-001\DOCS_SF:63657.3

8

TRUSTEE'S REPORT DATED JANUARY 31, 2009

over $2,012,000. The Merriman transactions included 10 receipts from various Merriman brokerage accounts totaling approximately $4,551,000 and 25 disbursements to various Merriman brokerage accounts totaling over $13,991,000.

Total disbursements to brokerage accounts exceeded $16,003,000. Of note, the majority of these disbursements (i.e. approximately $14,470,000) were made from one of the Debtor's two personal bank accounts. The remaining $1,533,000 was disbursed from a SHCP III bank account. None came from an account maintained by BDB or BDB III.

Total receipts from brokerage accounts approximated $4,551,000. Of note, the majority of these receipts (i.e. approximately $4,019,000) were deposited into one of the Debtor's two personal bank accounts. The remaining $532,000 was deposited into either a SHCP III bank account or a Sand Hill Ventures LLC bank account. Again, none went to BDB or BDB III.

As is discussed in the following section, LECG is missing a substantial amount of documentation related to the brokerage accounts. When this missing information is received, LECG will be able to identify additional receipt and disbursement activity between the bank accounts and brokerage accounts.

## III.

## BROKERAGE ACCOUNT ANALYSIS

To date, LECG has identified 35 individual brokerage accounts maintained at six different brokerages, including Shemano and Merriman. These brokerage accounts include Boots' personal accounts and accounts held in the names of related entities – including BDB, Sand Hill Capital and Sand Hill Venture Debt III. These accounts cover the time period from January 2004 through the current date. **Exhibit H** provides a summary identifying all brokerage accounts identified to date.

With respect to the brokerage accounts maintained at Shemano and Merriman for which LECG has documentation, LECG has analyzed 20 individual brokerage accounts with a total of 1,118 individual cash transactions – including the purchase and sale of various stock holdings and other cash receipt and disbursement activity – covering the time period from January 2004 through September 2008.

Of these transactions, 524 were receipts (i.e. deposits, transfers in and proceeds from the sale of stock) totaling over $76,263,000 and 594 were disbursements (i.e. checks, transfers out and purchases of stock) totaling over $76,257,600. Among the 1,118 cash transactions, LECG has documentation for 16 receipts totaling $18,186,000 and for 49 disbursements totaling $20,498,000. Pursuant to the available documentation, LECG has identified 13 receipts from Boots totaling approximately $6,553,000 and 20 disbursements to Boots totaling $7,844,500. The majority of these transactions appear to be transfers to and from Boots' personal bank accounts at Legacy Bank and United American.

LECG has worked with Trustee's counsel to prepare and serve document requests for additional brokerage statements and supporting documentation from Shemano's clearing broker (CSC) and Merriman and its prior clearing broker (Jefferies). Some documentation has been received from Merriman and Jefferies in response to some of these requests and LECG has analyzed this additional documentation. However, missing documentation has made a complete reconciliation impossible at this time. Once the missing documentation is obtained, a reconciliation of transactions between bank accounts and brokerage accounts will be completed.

## IV.

## CLAIMS ANALYSIS

**Exhibit I** is a summary listing of all claims asserted in any of these three cases, organized by claimant name. This exhibit is useful because it illustrates the overlap in the claims alleged by the claimants in the various cases. In many instances, especially among subscribers, persons who did business with either BDB or BDB III also made claims against the Boots estate sounding in tort. However, as demonstrated in "Description" section of **Exhibits J, K and L**, the vast majority of subscriber claims do not provide the Trustee or LECG with the information needed to perform the tracing analysis which will inform the parties and the Court with regard to the advisability of substantive consolidation of some or all of the Debtors.[5] Other claims are inscrutable for other reasons, including those alleged by entities related Sand Hill Capital.

---

[5] The Trustee has made written and oral requests to most subscribers (or their counsel) for this information. Future cooperation from the claimants in these cases with regard to such information will decrease administrative expenses and hasten the resolution of these cases.

**Exhibit M** is a unified compilation of **Exhibits J, K and L**, organized by claimant name, rather than by estate. It also compares the scheduled amounts ascribed by Boots to the claimed amounts stated in the proofs of claim.

While the foregoing exhibits are informative, the Trustee does not believe a classic claims analysis (and dividend projection) is possible at this time due to the vagaries of the claims descriptions and the uncertainties surrounding certain large claims, such as those alleged by Predators Holdings, LLC, and their constituent owners.

## V.

## CLAIMS HELD BY THE BDB ESTATES

Certain creditor parties requested that the Trustee report on the claims (and theories underlying potential claims) that might be available to the BDB and BDB III estates, particularly as such claims related to the Boots estate. Based upon the investigation described above and the information previously reported to creditors (including, for example, the fact that BDB III never had any brokerage account in its name and that $1 million apparently invested in that vehicle was spent to repay the very same investor on an unrelated loan as well as purchase stock in HTBK (which was the focus of BDB), it appears that monies provided to Boots in connection with any given investment opportunity were not always used in accordance with the wishes of the investor. Such activity could provide the BDB estates with claims for breach of fiduciary and conversion against Boots, as well as claims under trust theories for monies or assets diverted to other entities or to Boots. Those estates could also have avoidance claims sounding in fraudulent transfer against the recipients of such assets. However, the viability of such theories (or the need for them in order to return a fair dividend to creditors of BDB and BDB III), is really dependent on whether or not the

///

investments run by Boots should be deemed a Ponzi scheme. That determination must await the receipt and analysis of the information described above.

Dated: January 31, 2009          PACHULSKI STANG ZIEHL & JONES LLP

By  */s/ John D. Fiero*
    John D. Fiero
    Attorneys for R. Todd Neilson,
    Chapter 11 Trustee